1

2

3

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

4

5

6

7

8

9

FRANK HEARRING,

                           Plaintiff,

     v.

RICHARD SNYDER, *et al.*,

                      Defendants.

Case No. 3:20-CV-00049-ART-CLB

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE[1]**

[ECF No. 49]

10

11

12

13

14

15

16

       This case involves a civil rights action filed by Plaintiff Frank Hearring ("Hearring") against Defendants Perry Russell ("Russell"), Harold Wickham ("Wickham"), and John Henley ("Henley") (collectively referred to as "Defendants"). Currently pending before the Court is Defendants' motion for summary judgment. (ECF Nos. 49, 53[2], 66[3].) Hearring responded, (ECF No. 62), and Defendants replied. (ECF No. 64.) For the reasons stated below, the Court recommends that Defendants' motion for summary judgment, (ECF No. 49), be granted.

17

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

18

19

20

21

22

23

24

       On January 23, 2020, Hearring submitted a civil rights complaint under 42 U.S.C. § 1983 for events that occurred while Hearring was incarcerated at the Warm Springs Correctional Center ("WSCC") and the Northern Nevada Correctional Center ("NNCC"). (ECF Nos. 1, 1-1.) On April 6, 2021, Hearring filed a first amended complaint ("FAC"), which is the operative complaint in this case. (ECF No. 6.) On September 7, 2021, the District Court entered a screening order on Hearring's FAC, allowing Hearring to

25

26

27

28

---

[1]    This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]    ECF No. 53 is an erratum to the motion for summary judgment.

[3]    ECF No. 66 is an erratum to ECF No. 53.

proceed on First Amendment free exercise claims based on access to Taleem services and access to religious donations against Snyder,[4] Schreckengost,[5] Russell, Wickham, and Henley and a Fourteenth Amendment equal protection claim against Snyder, Schreckengost, Russell, and Wickham. (ECF No. 7 at 7.)

The FAC alleges constitutional violations arising from the following. First, Hearring is a devout Muslim who attempted to bring Taleem services to the prison Chapel, but Defendants intentionally interfered with the establishment of such services. (ECF No. 6 at 4, 12.) Second, Defendants interfered with donation requests for Muslim religious texts. (*Id.* at 5, 13-17.) Lastly, Hearring alleges that Defendants infringed on his ability to practice integral parts of the Muslim faith because they would not provide him a Qur'an. (*Id.* at 6-7.) The Court will discuss the factual allegations in turn.

**A.     Taleem Services (Claim 1)**

Hearring is a devout Muslim who attempted to bring Taleem services, or Islamic studies, to the prison chapel. (ECF No. 6 at 3-4, 12.) Taleem services are essential to the spiritual development of every Muslim and would be the Muslim inmates' only opportunity to aid one another in establishing an Islamic way of life, teach each other Arabic translations to become a complete Muslim, and to teach each other to avoid false gods. (*Id.* at 8.) Hearring asserted that he was able to partake in Taleem services at another institution, although he does not specify where. (*Id.* at 7.)

Hearring sent a kite to Chaplain Snyder requesting Taleem services, to which Chaplain Snyder responded that he could not process the request because Hearring did not request a specific day or time for the services. (ECF No. 49-2 at 23.) Hearring sent another kite specifying a day and time and Chaplain Snyder responded there was not

---

[4]     The Court dismissed Defendant Snyder on September 19, 2022, for failure to substitute a party within 90 days following a statement by Defendants noticing his death. (ECF No. 45.)

[5]     On August 18, 2022, the Court dismissed Defendant Schreckengost for failure to complete service of process pursuant to Federal Rule of Civil Procedure 4(m). (ECF No. 44.)

adequate staff to be present for Taleem services on a regular basis, which creates a safety and security concern. (*Id.* at 31.) Chaplain Snyder also explained that WSCC policy requires a volunteer or other staff member to be present for inmate-led Chapel services. (*Id.*)

Hearring grieved the issues relating to Taleem services in grievance 20063070002 ("Grievance 70002"), which was denied as a second level grievance. (ECF No. 49-2.) In response to Hearring's informal grievance over Taleem services, Chaplain Snyder reiterated that Hearring needed to find a qualified volunteer to lead Taleem as there is not adequate staff to cover the extended time needed for the service. (*Id.* at 14.) Chaplain Snyder explained that other religious services have volunteer leaders, whereas there is not a volunteer for Muslim services, which is why the Chaplain or another correctional officer leads Jumah services. (*Id.*) In response to the first level grievance, Russell responded that "if you can find a qualified volunteer to lead Taleem, then Administration will positively consider such a service. There are not adequate WSCC staff to cover additional religious services in the chapel." (*Id.* at 9.) Additionally, the response to Hearring's informal grievance regarding Taleem services noted that "Muslim inmates are free to study the Muslim faith on their own time without receiving a notice of charges." (*Id.*)

Defendants provide AR 810.3, the NDOC Religious Practice Manual ("Manual") which outlines the procedures for the practice of religion in NDOC facilities. (ECF No. 49-6, ECF No. 53-1 at 3.) The stated purpose of the Manual is to allow inmates to "practice a recognized religion to which they ascribe within the limitations imposed by individual physical structures, staffing levels, other considerations of security, good order and discipline, consistent with consideration of costs and limited resources." (ECF No. 49-6 at 4.) To request new or additional religious services or meetings, AR 810.3(11)(D) requires the group or individual to make a written request to the institution where they are currently housed by sending an inmate request form ("kite") to the Chaplain or other designee. (ECF No. 49 at 14, ECF No. 49-6 at 16-17.) Upon receiving a written request or additional services, the Chaplain will consider if there are

already services that meet the request, if adequate similar meetings for that faith group already exist, the availability of Chapel time slots in consideration of the needs of other faith groups, and the number of inmates who would participate. (ECF No. 49-6 at 17.) Although inmates *may* be appointed to facilitate religious services, the Manual explains "inmates do not have the right to facilitate or lead services, or to teach classes." (ECF No. 49-6 at 10, 25, ECF No. 53-1 at 3.)

### B.  Donation Requests (Claim 2)

In Claim 2, Hearring alleges that Defendants destroyed two donation applications, although Defendants were "well aware" of the Muslim community's need for the donations for the purpose of spiritual development. (ECF No. 6 at 12.) Hearring sent a kite containing the first requests for donations of Islamic study materials from Qur'an Account Inc. to Chaplain Snyder because Qur'an Account Inc. needed certain information from the Chaplain in order to send the materials. (*Id.* at 13.) After six months without an update regarding the first request, Hearring contacted Qur'an Account Inc. to determine whether they had received information from Chaplain Synder. (*Id.*) Qur'an Account Inc. responded that they had sent the form to Chaplain Snyder, but he had not returned the form. (*Id.*) Following the reply from Qur'an Account Inc., Hearring sent another kite to Chaplain Snyder asking for information about the donation requests. (*Id.*) Chaplain Snyder responded that "[y]ou are not involved in the donation process. Donations are made to the chapel, not individual inmates." (*Id.*) Hearring alleges that Chaplain Snyder, Russell, Schreckengost, and Wickham intentionally impeded, hindered, and blocked Hearring's attempts to study, worship, and establish the Islamic faith. (*Id.* at 17-18.) Hearring grieved this issue in grievance 20063084625 ("Grievance 84625"). Specifically, Hearring alleged that Chaplain Snyder was discriminating against Muslims and failed to process Hearring's requests for donations of Islamic study materials. (ECF No. 49-3.) Grievance 84625 was denied as a second level grievance. (ECF No. 49-3 at 2.)

The Manual provided by Defendants also outlines the procedures for personal

religious property. Personal religious property may "[b]e purchased from the Canteen, donated by an approved source, or if unavailable through the Canteen purchased from a legitimate religious organization or a Department approved vendor. Vendors will be approved by the RRT." (ECF No. 49 at 16, ECF No. 49-6 at 30.) Additionally, "[t]he NDOC shall not be responsible for the financial procurement of faith/non-faith property." (ECF No. 49-6 at 34.) The general donation process requires use of the Donation Request Form ("DOC 4514") and pre-approval from the Warden or other designee before an institution or facility takes custody of any donated item. (ECF No. 49-6 at 34.)

### C.    Access to a Qur'an (Claim 3)

In Claim 3, Hearring alleged that Defendants continued to obstruct his right to freely practice the Islamic faith because they would not provide him with a Qur'an. (ECF No. 6 at 6-7.) When Hearring requested one, Russell told Hearring that a Qur'an was not available at that time. (*Id.* at 7.) Hearring filed grievance 20063111564 ("Grievance 11564") relating to this claim which was denied as an informal grievance. (ECF No. 49-4.) Henley responded to the grievance saying that Hearring had "not demonstrated any loss or harm." (ECF No. 6 at 7.) The improper grievance memo denying Grievance 11564 specifically instructed Hearring to resubmit the grievance along with all previously submitted grievance documents, including the improper grievance memo. (ECF No. 49-4 at 2.) The memo also states that "[f]ailure to re-submit the grievance through the prescribed timeframe shall constitute abandonment." (*Id.*) However, Grievance 11564 was not refiled. (*See* ECF No. 49-5.)

### D.    Motion for Summary Judgment

On January 19, 2023, Defendants filed the instant motion for summary judgment arguing summary judgment should be granted because: (1) Russell, Wickham, and Henley did not personally participate in any constitutional violation; (2) Hearring's First Amendment rights were not violated; (3) Hearring's Fourteenth Amendment rights were not violated; (4) Hearring failed to exhaust his administrative remedies for his claims regarding being able to obtain a Qur'an; and (5) Defendants are entitled to qualified

immunity. (ECF No. 49.)

Hearring responded, arguing that Defendants failed to show they were using the least restrictive means or that compelling interests prevented them from allowing religious practices. (ECF No. 62.) Hearring argues that Defendants are not entitled to qualified immunity. (*Id.* at 8.) Hearring also argues that he did exhaust his administrative grievances because the grievance he did submit properly put Defendants on notice for purposes of this lawsuit. (*Id.* at 8-9.) Finally, Hearring requests that discovery be reopened because he is entitled to receive the record associated with Russell's declaration, attached as an exhibit to Defendants' motion for summary judgment, under the Federal Rules of Evidence. (*Id.* at 9-10.)

On June 21, 2023, Defendants filed their reply. (ECF No. 64.) Defendants reiterated their argument that each Defendant lacked personal participation in any alleged constitutional violation and that Hearring failed to exhaust his administrative remedies as to receiving a Qur'an. (*Id.* at 3-5, 7-8.) Defendants also point out Hearring incorrectly applied the least restrictive means standard in his opposition, the standard under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which is not required by the First or Fourteenth Amendment. (*Id.* at 3, 5-7.) As to Hearring's argument in his opposition that he is entitled to records associated with Russell's declaration, Defendants argue that discovery closed four months prior to making the request and therefore the request is improper and would only serve to further delay the litigation.[6] (*Id.* at 8-9.)

---

[6]     Federal Rule of Civil Procedure 16(b)(4) governs the modification of scheduling orders and discovery plans. Fed. R. Civ. P. 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Local Rule 26-3 states if a request to extend a deadline occurs "after the expiration of the subject deadline," the request will not be granted "unless the movant also demonstrates that the failure to act was the result of excusable neglect." LR 26-3. Rule 60(b)(1) of the Federal Rules of Civil Procedure states that "whether neglect is excusable depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." Fed. R. Civ. P. 60(b)(1). Hearring does not allege that he

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law applicable to the claim or claims determines which facts are material. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of the suit can preclude summary judgment, and factual disputes that are irrelevant are not material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The parties subject to a motion for summary judgment must: (1) cite facts from the record, including but not limited to depositions, documents, and declarations, and then (2) "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Documents submitted during summary judgment must be authenticated, and if only personal knowledge authenticates a document (i.e., even a review of the contents of the document would not prove that it is authentic), an affidavit attesting to its authenticity must be attached to the submitted document. *Las Vegas Sands, LLC v. Neheme*, 632 F.3d 526, 532-33 (9th Cir. 2011). Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007);

needs to reopen discovery due to excusable neglect, nor does he address the factors established by Federal Rules of Civil Procedure 60(b)(1). Hearring only alleges he is entitled to the information under the Federal Rules of Evidence. (ECF No. 62 at 9-10.) This is insufficient to modify a discovery order and therefore discovery will not be reopened. Therefore, Hearring's request for records relating to Russell's declaration is denied.

1    *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

2        The moving party bears the initial burden of demonstrating an absence of a
3    genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the
4    burden of proof on an issue at trial, the movant must affirmatively demonstrate that no
5    reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d
6    at 984. However, if the moving party does not bear the burden of proof at trial, the
7    moving party may meet their initial burden by demonstrating either: (1) there is an
8    absence of evidence to support an essential element of the nonmoving party's claim or
9    claims; or (2) submitting admissible evidence that establishes the record forecloses the
10   possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v.*
11   *Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine*
12   *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence
13   and any inferences arising therefrom in the light most favorable to the nonmoving party.
14   *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not
15   meet its burden for summary judgment, the nonmoving party is not required to provide
16   evidentiary materials to oppose the motion, and the court will deny summary judgment.
17   *Celotex*, 477 U.S. at 322-23.

18       Where the moving party has met its burden, however, the burden shifts to the
19   nonmoving party to establish that a genuine issue of material fact actually exists.
20   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986). The
21   nonmoving must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co.*
22   *v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal
23   quotation omitted). In other words, the nonmoving party may not simply rely upon
24   the allegations or denials of its pleadings; rather, they must tender evidence of specific
25   facts in the form of affidavits, and/or admissible discovery material in support of its
26   contention that such a dispute exists. *See* Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at
27   586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show
28   more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp.*

8

*Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When a pro se litigant opposes summary judgment, his or her contentions in motions and pleadings may be considered as evidence to meet the non-party's burden to the extent: (1) contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

Upon the parties meeting their respective burdens for the motion for summary judgment, the court determines whether reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). The court may consider evidence in the record not cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). Nevertheless, the court will view the cited records before it and will not mine the record for triable issues of fact. *Oracle Corp. Sec. Litig.*, 627 F.3d at 386 (if a nonmoving party does not make nor provide support for a possible objection, the court will likewise not consider it).

## III.    DISCUSSION

### A.    Failure to Exhaust

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The

requirement's underlying premise is to "reduce the quantity and improve the quality of prisoner suits" by affording prison officials the "time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Id.* at 524–25.

The PLRA requires "proper exhaustion" of an inmate's claims. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Proper exhaustion means an inmate must "use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Thus, exhaustion "demands compliance with an agency's deadlines and other critical procedural rules because no adjudication system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91.

In the Ninth Circuit, a motion for summary judgment will typically be the appropriate vehicle to determine whether an inmate has properly exhausted his or her administrative remedies. *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014). "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166. The question of exhaustion "should be decided, if feasible, before reaching the merits of a prisoner's claim." *Id.* at 1170.

Failure to exhaust is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). The defendant bears the burden of proving that an available administrative remedy was unexhausted by the inmate. *Albino*, 747 F.3d at 1172. If the defendant makes such a showing, the burden shifts to the inmate to "show there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were

ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).

As discussed above, there are three relevant grievances in this case: (1) Grievance 70002 for Claim 1; (2) Grievance 84625 for Claim 2; and (3) Grievance 11564 for Claim 3. Defendants argue that because Hearring failed to resubmit Grievance 11564, he failed to exhaust his administrative remedies pertaining to being provided a Qur'an. (ECF No. 49 at 18.) Hearring acknowledges that he did not resubmit Grievance 11564 but argues he did exhaust his claim because what he did submit "clearly put officials on 'adequate' notice of the problem for which plaintiff seeks redress." (ECF No. 62 at 9 (citations omitted).)

Defendants provide authenticated and admissible evidence to support their argument. The improper grievance memo denying Grievance 11564 specifically instructed Hearring to resubmit the grievance along with all previously submitted grievance documents, including the improper grievance memo. (ECF No. 49-4 at 2, ECF No. 66 at 3.) The memo states that "[f]ailure to re-submit the grievance through the prescribed timeframe shall constitute abandonment." (*Id.*) Proper exhaustion means an inmate must "use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Here, Hearring was directed to resubmit Grievance 11564, or the grievance would be considered abandoned. Therefore, the undisputed evidence viewed in the light most favorable to Hearring shows a failure to exhaust his administrative remedies for Grievance 11564. *Albino*, 747 F.3d at 1166.

Now the Court must evaluate which claims can proceed given the failure to exhaust Grievance 11564 by determining which claims Hearring did fully exhaust. Grievance 70002 relates to Claim 1 and was denied as a second level grievance. (ECF No. 49-2, ECF No. 66 at 3.) Grievance 70002 does not address receiving a Qur'an. (*Id.*) Grievance 84625 relates to Claim 2 and the allegations that Chaplain Snyder was discriminating against Muslims and failed to process Hearring's requests for donations

of Islamic study materials in general but does not specify any particular material that was requested. (ECF No. 49-3, ECF No. 66 at 3.) Grievance 84625 was also denied as a second level grievance. (ECF No. 49-3 at 2.) The second level grievance forms clearly indicate that the form ends the formal grievance process. (*Id.*) Defendants do not argue Hearring failed to exhaust his administrative remedies as to Claims 1 and 2. (*See* ECF Nos. 49, 64.) Therefore, Defendants are entitled to summary judgment for failure to exhaust as to those claims arising out of Claim 3.

## B.    First Amendment Free Exercise

"The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citations omitted); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). In order to implicate the Free Exercise Clause, the inmate's belief must be both sincerely held and rooted in religious belief. *See Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008). "A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). A regulation that impinges on First Amendment rights "is valid if it is reasonably related to legitimate penological interests." *Turne v. Safley*, 482 U.S. 78, 89 (1987). Additionally, the free exercise clause does not entitle a prisoner "to have the clergyman of his choice provided for him in the prison." *Reimers v. State of Or.*, 863 F.2d 630, 632 (9th Cir. 1988) (citing *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir.1987); *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir.1970)).

The factors *Turner* cited as relevant to the inquiry of whether the restrictions are reasonably related to legitimate penological interests are: (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that

remain open to inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91. "The burden ... is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted).

The Court's screening order allowed Hearring to proceed on a First Amendment free exercise of religion claim because he was prevented from having Taleem services and Defendants obstructed the donation of Muslim religious items from an outside source. (ECF No. 7 at 6.) As a threshold matter, Defendants do not appear to question Plaintiff's sincerely held religious beliefs, that those beliefs require him to attend Taleem services, or that he needs Islamic study materials. Each of Hearring's First Amendment claims will be addressed in turn.

### 1.    Taleem Services

To decide whether Hearring's First Amendment rights were violated by the failure of Defendants to allow Taleem services, the Court must engage in an analysis under *Turner* of the reasonableness of the restrictions in light of the concerns posited by the Defendants. Defendants do not mention the *Turner* factors in their motion for summary judgment. However, the Court will evaluate the factors with the information provided by Defendants in their motion as to Taleem services and donation requests.

Defendants argue Hearring's requests to hold Taleem services were denied because he did not have a volunteer to lead the services, which is required at WSCC. (ECF No. 49 at 14, ECF No. 49-2 at 2, ECF No. 66 at 3.) Defendants represent that all Chapel services other than Muslim services are led by volunteers. (ECF No. 49 at 14.) However, due to lack of volunteers for Muslim services, the Chaplain or another caseworker lead Muslim Jumah services. (ECF No. 49-2 at 14, ECF No. 66 at 3.) Additionally, Defendants argue that they are entitled to summary judgment because Hearring was free to participate in Taleem services on his own, just not in the Chapel at a regularly scheduled date and time. (ECF No. 49 at 14.) Hearring argues that

Defendants did not use the least restrictive means in denying his requests for Taleem services and that he attempted to submit requests for Islamic study material donations, but the requests were not acknowledged. (ECF No. 62 at 7.) Hearring's request for Taleem services was ultimately denied because he could not identify a volunteer to lead the service because there was no available staff due to the existing Chapel schedule. (ECF No. 49-2 at 2, 14, ECF No. 66 at 3.)

The Court will now evaluate the first *Turner* factor, whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89-91. In *Anderson v. Angelone*, the Ninth Circuit held that Nevada's prohibition on inmate-led religious services does not violate the First Amendment because it is reasonable and constitutional under *Turner* and *O'Lone*. 123 F.3d 1197, 1199 (9th Cir. 1997). The Ninth Circuit reasoned that requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security and helps ensure that inmate activity is supervised by responsible individuals and lessens the possibility that inmate religious groups will subvert prison authority. *Id.* As the instant case involves the same prohibition on inmate-led religious services, the Court finds there is a valid, rational connection between the regulation and its legitimate administrative and safety concerns. Therefore, the first *Turner* factor weighs in favor of Defendants. *Anderson*, 123 F.3d at 1199.

Second, the Court must evaluate whether Hearring has "alternative means by which he can practice his religion" or is "denied all means of religious expression." *Shakur*, 514 F.3d at 886. The relevant inquiry is not whether the inmate has an alternative means to engage in the particular religious practice that he claims is being restricted; rather, the inquiry is whether the inmate has been denied all means of religious expression. *O'Lone*, 482 U.S. at 351-52. Further, where "other avenues" remain available for plaintiff to exercise his religious rights, courts should be particularly conscious of the deference owed to prison administrators. *Turner*, 482 U.S. at 90. In *Anderson*, the Ninth Circuit also found that there are other ways for the inmates to

exercise their rights, such as assisting the prison Chaplain in leading religious activities. *Anderson*, 123 F.3d at 1199. Additionally, Hearring was given assurances that he could study the Muslim faith on his own time without receiving a notice of charges. (ECF No. 49-2 at 14, ECF No. 66 at 3.) Therefore, the second *Turner* factor weighs in favor of Defendants.

Under the third *Turner* factor, the Court is required to consider the "impact accommodation … will have on guards and other inmates, and on the allocation of prison resources generally." *Washington v. Harper*, 494 U.S. 210, 225 (1990). The Court may consider security concerns in evaluating the third *Turner* factor. *See McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir. 1987). In denying Hearring's informal grievance on this issue, Chaplain Snyder responded that Hearring needed to find a qualified volunteer to lead Taleem as there is not adequate staff to cover the additional service. (ECF No. 49-2 at 14, ECF No. 66 at 3.) In the response to Hearring's first level grievance, the official response explained that the current Chapel schedule "has taxed staffing to its limit." (*Id*.) Defendants state they require a staff member be present at inmate-led services in the Chapel for safety and security reasons. (ECF No. 49 at 14.) Given these representations, the Court finds that the accommodation would impact the safety and security of guards and other inmates as described by Defendants. *See McCabe*, 827 F.2d at 637; *Anderson*, 123 F.3d at 1199.

Finally, as to the fourth *Turner* factor, the Court considers whether the presence of ready alternatives undermines the reasonableness of the regulations. *Turner* does not impose a "least-restrictive-alternatives test," but asks whether the inmate "has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 U.S. at 136 (citing *Turner*, 482 U.S. at 90-91). Hearring has not provided evidence as to this issue other than to state that he was able to attend Taleem services at another unidentified institution. (ECF No. 6 at 7.) Hearring does not explain why another institution's ability to hold Taleem will not impose more than a *de minimis* cost to the valid penological goal at another institution. There are many reasons why one

facility may be able to offer more services, for example the previous institution may have been better staffed or house inmates with lower classification levels. Therefore, the fourth *Turner* factor weighs in favor of Defendants.

In sum, the analysis of the *Turner* factors shows that all four factors weigh in favor of Defendants for the claim relating to Taleem services. Therefore, Defendants are entitled to summary judgment as to the Taleem services portion of Hearring's First Amendment free exercise claim.

### 2.    Donation Requests

Before analyzing the *Turner* factors, the Court must find that the regulation in question places a substantial burden on the free exercise of religion. The First Amendment does not reach the "incidental effects" of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988). Where the plaintiff shows only an "inconvenience on religious exercise," and not "substantial pressure ... to violate his beliefs," the Court need not conduct an analysis of the *Turner* factors. *Jenkins v. Sinclair*, 2018 WL 4608312, *7 (W.D. Wash. Sept. 4, 2018) (citing *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)).

Hearring argues he attempted to receive donations twice by sending a kite along with a form from Qur'an Account Inc. to Chaplain Snyder because Qur'an Account Inc. needed information from Chaplain Snyder. (ECF No. 6 at 13-17.) The general donation process requires use of the Donation Request Form ("DOC 4514") and pre-approval by the Warden or other designee before the facility takes custody of the donation. (ECF No. 49-6 at 34, ECF No. 53-1 at 3.) Specifically, approved organizations may donate items only after filling out DOC 4514. (*Id.*) Defendants provide authenticated, admissible evidence showing the donation procedure itself did not deprive Hearring of his access to a Qur'an, but rather Hearring's failure to follow the procedure and submit DOC 4514 doomed his request. (ECF No. 49-3 at 2, 8, 12, ECF No. 66 at 3.)

Additionally, there are no facts to show the donation procedure forecloses other avenues for inmates to receive religious texts. Defendants represent that Hearring is free to purchase a Qur'an through the canteen. (ECF No. 49 at 15.) According to the Manual, personal religious property may "[b]e purchased from the Canteen, donated by an approved source, or if unavailable through the Canteen purchased from a legitimate religious organization or a Department approved vendor." (ECF No. 49 at 16, ECF No. 49-6 at 30, ECF No. 53-1 at 3.) Thus, as a threshold matter, the regulations for religious donations do not substantially burden the free exercise of religion. *Lyng*, 485 U.S. 439, 450-51 (1988).

However, even if the donation procedures did place substantial burden on the free exercise of religion, the regulation satisfies the *Turner* factors. First, there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89-91. The NDOC Religious Practice Manual acknowledges that the regulations seek to strike a balance between the constitutionally protected rights retained by inmates to exercise the religion of their individual choice and considerations of safety, security, and custody levels of each institution or facility. (ECF No. 49-6 at 4, ECF No. 53-1 at 3.) Specifically, Defendants argue that if the NDOC did provide prisoners with religious texts, they might run afoul of the Establishment Clause. In *McElyea v. Babbitt*, the Ninth Circuit indicated that a state may violate the Establishment Clause by providing inmates with Jewish literature. 833 F.2d at 199. Avoiding a constitutional violation is necessarily a legitimate governmental interest and therefore the first factor weighs in favor of Defendants.

The second and fourth factors, "whether there are alternative means of exercising the right that remain open to inmates," the "absence of ready alternatives," and "existence of obvious, easy alternatives," also weigh in favor of Defendants. *Turner*, 482 U.S. at 89-91. Where "other avenues" remain available for plaintiff to exercise his religious rights, courts should be particularly conscious of the deference owed to prison administrators. *Id.* at 90. As explained above, the Manual clearly

outlines three paths for inmates to access religious property such as a Qur'an if Hearring cannot receive donated religious materials. (ECF No. 49-6 at 30, ECF No. 53-1 at 3.) Therefore, the second and fourth factors weigh in favor of Defendants.

Under the third *Turner* factor, the Court is required to consider the impact the accommodation will "have on guards and other inmates, and on the allocation of prison resources generally." *Washington v. Harper*, 494 U.S. 210, 225 (1990). As mentioned earlier, Defendants state they cannot provide specific religion with their specific religious texts as it would likely violate the Establishment clause. (ECF No. 49 at 16.) Additionally, NDOC has a stated policy that "[t]he NDOC shall not be responsible for the financial procurement of faith/non-faith property." (ECF No. 49-6 at 34, ECF No. 53-1 at 3.) Regardless of any constitutional implications, requiring NDOC to change this policy and begin providing inmates with their religious texts would divert financial resources that prison administrators determined should be allocated elsewhere. *See Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (when accommodating an inmate's demands "would cause a significant reallocation of the prison system's financial resources and would impair the ability of correctional officers to protect all who are inside a prison's walls," the court is "'particularly deferential' to prison administrators' regulatory judgments (quoting *Turner*, 482 U.S. at 90)). Therefore, the third *Turner* factor weighs in favor of Defendants.

Based on the above, the Court finds that the NDOC's policy regarding religious donations and provision of alternative paths for inmates to access religious texts is reasonably related to the prison's penological interests and is valid under *Turner*. Therefore, Defendants are entitled to summary judgment as to Hearring's First Amendment free exercise claim relating to receiving donations of religious texts.

## C. Fourteenth Amendment Equal Protection

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur*, 514 F.3d at 891 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). The preliminary inquiry in an equal protection claim is identifying the plaintiff's relevant class, which is "comprised of similarly situated

persons so that the factor motivating the alleged discrimination can be identified." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (internal quotation omitted). Prisoners are protected by the Equal Protection Clause from intentional discrimination on the basis of their religion. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citing *Cruz v. Beto*, 405 U.S. 319, 321-22 (1972) (per curiam)), abrogated on other grounds by *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). "[A] plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003). As the claim requires proof of intentional discrimination, "[m]ere indifference" to the unequal effects of a particular class does not establish discriminatory intent. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

The Court allowed Hearring to proceed on the Fourteenth Amendment equal protection claim based on his allegations that Muslim inmates do not have access to Islamic religious items such as Qur'ans and prayer rugs, but Christian inmates have access to Bibles. (ECF No. 6 at 14.) Additionally, Hearring alleged that Defendants disallowed Muslim donations, thereby denying his ability to practice integral parts of his Muslim faith. (*Id.* at 17.) As outlined above, Hearring failed to exhaust his administrative remedies as to the claim that Defendants failed to provide him a Qur'an and therefore this claim could proceed only as to the allegations that Defendants blocked Muslim donations.

Defendants argue they are entitled to summary judgment on this claim because the reason the donation requests were not granted was Hearring's failure to follow NDOC procedures for obtaining donations, not because he was requesting Muslim donations. (ECF No. 49 at 16.) Defendants explain that donations from community faith organizations play a major role in what is accessible to inmates and NDOC does not decide what donations are provided. (*Id.*) Further, Defendants argue the NDOC uses the donation process because if the NDOC were to provide a specific religion with specific religious texts, it would likely run afoul of the Establishment Clause of the

Constitution. (*Id.*) In response to Defendants' motion, Hearring reiterates that he attempted to receive donations on numerous occasions and Chaplain Snyder failed to facilitate the requests. (ECF No. 52 at 5.) In their reply, Defendants point out that Chaplain Snyder is no longer a party to this lawsuit and argue the remaining Defendants did not personally participate in the alleged constitutional violations. (ECF No. 64 at 3-5.)

First, the Court will evaluate whether Defendants have met their initial burden on the motion for summary judgment. Where, as in the instant case, the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas.*, 905 F.3d at 593-94; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102. Here, Defendants provide authenticated and admissible evidence showing Hearring's donation requests were not fulfilled because he failed to comply with the donation process by using DOC 4514. (ECF No. 49-3 at 2, 8, 12, ECF No. 66 at 3.) Defendants satisfy their burden for summary judgment by showing the reason the donations requests were not processed was based on Hearring's failure to follow NDOC procedures and not because he is Muslim. *Serrano*, 345 F.3d at 1082 ("[A] plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class.").

Now, the burden shifts to Hearring to establish that a genuine issue of material fact actually exists by going beyond the pleading to provide evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *Pac. Gulf Shipping Co.*, 992 F.3d at 897; *See Fed.*R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. Hearring does not provide any additional evidence to support his claim. (*See* ECF No. 62.) Hearring merely reiterates his allegations from the complaint that Chaplain Snyder refused to acknowledge his

1  attempts to receive donations but does not provide evidence sufficient to support a
2  finding of a genuine dispute of material fact. (*Id.* at 5.) Therefore, Defendants are
3  entitled to summary judgment on this claim.[7]

## IV.    CONCLUSION

For good cause appearing and for the reasons stated above, the Court
recommends that Defendants' motion for summary judgment, (ECF No. 49), be granted.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of
Practice, the parties may file specific written objections to this Report and
Recommendation within fourteen days of receipt. These objections should be entitled
"Objections to Magistrate Judge's Report and Recommendation" and should be
accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any
notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the
District Court's judgment.

## V.    RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary
judgment, (ECF No. 49), be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** in favor of
Defendants and **CLOSE** this case.

**DATED**:   June 27, 2023   .

_____
**UNITED STATES MAGISTRATE JUDGE**

---

[7]    Because the Court recommends that Defendants' motion for summary judgment be granted in its entirety based on a finding that no constitutional violations occurred, it need not address Defendants' arguments regarding qualified immunity or personal participation.